Processors LLC v. American Guarantee and Liability Insurance Company. Ms. Condry? May it please the court. Good morning. I'm Lisa Condry. I represent the appellant and cross-appellee Hollybrook Cottonseed Processing. Hollybrook was formed in Lake Providence, Louisiana for the purpose of processing cottonseed into three distinct marketable products. The company lost a tremendous amount of money during the time that it operated and ultimately ceased operating because of defects in equipment it purchased from AGLIC's insured Carver Manufacturing. The fact that that equipment contained a retributory defect under Louisiana law is unchallenged here today. The jury also found that the sudden and accidental breakdowns of the Carver equipment caused Hollybrook to lose the use of its plant as a whole. That finding is also unchallenged today. What is challenged and what has been the heart of AGLIC's case with Hollybrook from day one is damages. Because AGLIC had a carrot dangling in front of them of a four million dollar credit against any jury verdict, Hollybrook could hope to obtain because of its excess insurer status. So the case, while we tried it on all issues, Carver's engineers testified under oath that the equipment was in fact defective in manufacture and design. None of those issues were really what we were fighting about. We were fighting about AGLIC had a three-pronged trial strategy. The first was to obfuscate and make the jury believe in their theory that, hey, it doesn't matter that the equipment was defective. This was a new company. It was a complicated scenario with three products. These guys weren't going to be successful anyway, so no harm no foul. The second strategy that a defense expert who came in and said the value of the company is $3,500. That is what Hollybrook's damages are because that's what it was the day he evaluated it when it was a defunct company and there was no analysis of how did he get where it was. On the other hand, Hollybrook, because of the nature of the case, had a rather sophisticated damage model that required computing commodities and three different that were marketed to different markets and in different ways. Dr. Richardson had a model that took into consideration if Hollybrook sold all of its products at the least amount, the cheapest products it was going to make, over a certain amount of time, it would make $6 million plus. If it sold the highest price things, it'd make up to $11 million. There was testimony in between of what the marketing effects were, etc., etc., but essentially the jury is sitting there and they've got $3,500 versus millions of dollars. What to do? That brings us to the third prong of AJLIC's strategy. We have the witness on the last day of a two-week trial. Last witness say to the jury, all Hollybrook wanted was $750,000 and a new high sell. They lobbed a $750,000 skunk into the jury box and it caused quite a commotion. The judge very astutely and very quickly silenced the lawyers before more harm could have been done and whisked the jury out of the room promptly. It was clear that something unusual, something big had happened. At that point, Judge Foote became the trier of fact on what exactly had happened. What was unchallenged then and unchallenged today is her finding of fact that letting that information get to the jury was intentional, calculated, it was rehearsed, it was a trial strategy designed to gain an unfair advantage on an essential element of the plaintiff's claims, which was damages. As the appellant, so you're only challenging the attorney's fees issue, is that right? Yes sir, but I'm addressing everything in my one time. I understand that you need to do that. Why don't you go ahead and address your point as the appellant and get that out of the way. Okay, yes sir. On the attorney fees, we necessarily have to get into somewhat of the insurance coverage issues. Coverage in this case is basically one insurance law 101. Judge Southwick was on the Mark Co. panel. It is almost a virtual roadmap for this case and its analysis and the factual scenario. Holly Brook has demonstrated under the policy that it had suffered property damage and because of that, all consequences, the results that flow from the loss of use of this plan are covered under this all-risk liability insurance policy, which means that all risks arising out of and as a consequence of that property dent are covered unless they are excluded. And in Louisiana, in a redhibition case, attorney fees are statutorily mandated damages and I've cited a Louisiana case that specifically says these are not penalties, these are damages. And as such, they should be covered under this policy. There is nothing in this policy that says we don't pay for attorney fees, we don't pay for penalties. It doesn't say that it says we pay all damages that our insured is legally obligated to pay. And they want to say, well, there's just no coverage anyway because of the work product exclusion. The work product exclusion does apply, but it only applies to that part of the judgment that gave us the return of the purchase price of the carver equipment. We've acquiesced in that all along. I was a little surprised that that was one of the matters the jury addressed. Was this not fought out beforehand and Judge Foote allowed, nonetheless allowed this issue to go to the jury on the value of under this circumstance that the 380 on the second trial, we, um, it was in there, there was a line item, everybody agreed, but the parties agreed ahead of time that that would never be formed the basis of the judgment. We understood that that was excluded. So completeness of the story for the jury was the reason that was there to inform. Yes. Yes. Just because under the redhibition law, as it was read to the jury, that was a part of our damages, the return of the purchase price, but we had agreed beyond that. We understood that exclusion. We don't get that, but that exclusion doesn't contain the doesn't read the way they want it to read it. They are inserting the word or we are talking about. We know we don't get anything for damage to or return of the purchase price of their equipment, but damages that result from the defects that caused the use of the plant, loss of use of the plant, we are entitled to, and there is absolutely nothing in this policy that says we aren't. In fact, and there's several Louisiana cases on point that says when a policy indemnifies for damages on account of property damage, it must respond for damages that result from property damage, but which themselves do not fall within the definition of property damage. I'm not saying, and that's where I think Judge Walter went astray. He was trying to say our attorney fees property damage. We're not saying that. We're saying that they are the result of the property damage, and therefore they are covered under the policy, and in Louisiana, it's a given. In a retribution case, you are entitled to your attorney fees. That is a part of your damages. The whole purpose of the statute is to put you back to your status quo. May I reserve more time at this point to address the other issues, or shall I go forward with my opening argument, and then in your rebuttal, you'd be only responding to what Mr. Kennedy has to say, and you have five minutes for rebuttal. Okay. Well, Your Honor, what I would like to go back to again is we've touched on the whole coverage issue. Coverage in this case, because of the jury's finding of the sudden and accidental breakdown causing loss of use, that triggers the exception to the impaired property exclusion. We are on all fours. There's nothing novel under an insurance coverage basis in this case whatsoever about this policy language and about the facts of this case that would warrant deviating from this court's prior rulings that I think set clear precedent. Mark Coe, Riley Stoker, which all went back to the Stewart case in Louisiana. Going back to the issue of the new trial, what happened after she found her findings of fact, the jury deliberates and they came back with $1,750,000. There's that $750,000 skunk again. At that moment, I feel like everybody who knew what had happened in that court and did, was an unfair advantage gained. Did the lingering smell go into... So your theory on that is that the jury just added a million dollars to the $750,000 that it had... I think that's a reasonable assumption. That number doesn't correspond to any particular set of damages otherwise. If you look at the range of the testimony, is it split in the difference between... You talked about a variety of information the jury was given. Is it split in the difference between essentially zero, that there was some testimony about $3,500,000 I guess it was, and some other number they got? No sir, not to me. The other $3,500,000, there was a $2,000,000 loss of initial investment and there were also losses attributed to contracts that we could not fulfill and lost money on those as well in the form of judgments and payments. So there is no rational basis to come up to the 1.75, but at the end of the day, what is supposed to happen under that scenario is that we're all supposed to have a level playing field. We're not supposed to gain, break the rules and ignore a direct court order on an issue and then say, well, we'll never really know whether it counted or it didn't count. And that's why Rule 59 and that's why the duty of a judge is to make sure that a miscarriage of justice does not take place. And Rule 59 specifically allows for her to grant a new trial if she feels like there was prejudice and that prejudice is determined whether, if you can't at the end of the case say, I, that could have been the reason we got that jury verdict. And that's an abuse of discretion standard as I understand it, the granting of the motion for new trial. Yes sir. And, and usually she's given great deference on that because in a situation like this, she was there. She was the finder of fact. She saw how it progressed. She saw the effect. And then at the end of the day said, as my client said to me, what happened? They cheated. Can't we go ask the court, the jury to ask, find out? And I said, no, that's why we have Rule 59. That's what we can do. And she did the right thing under that. The next jury came back at six million dollars. The new trial should not be imposed as a punishment. It should only be imposed or granted after there's been a determination that there was, that the jury was, was tainted with the improper information. Isn't that right? That is right. And all that she could do on that, because we're not allowed to poll the jury, we'll never know for sure, is say given the totality of the circumstances she witnessed and the totality of a two-week trial and all the evidence, she had no fair assurance in her mind that the jury deliberations were not improperly influenced. And she gave us a day where we had a chance to go back without any more skunks to see what happened. And we had known, we had the same witnesses, the same experts, and the next jury came back at six million dollars. There were no skunks. Everyone followed the rules. All right. Anything else, Ms. Condry? No. All right. You've saved your full time for rebuttal. Mr. Kennedy? I plead the court. My name is Robert Kennedy. I'm with the law firm of Cookie, Ancy King & Galloway in Shreveport. I represent American Guarantee and Liability Insurance Company. As the court knows, we've got two issues here the court has to decide. One is the attorney's fees, whether there's coverage for attorney's fees, and the other is the new trial issue, whether or not Judge Foote abused her discretion when she concluded that the first jury ignored completely her curative instruction, rendered a verdict that effectively denied Hollybrook its right to a fair trial. If the court reinstates the first verdict, then the court doesn't need to get to the next two issues, those being whether economic damages allegedly sustained by Hollybrook were excluded by the work product exclusion, and then the issue about the other compensatory damage award. This was, as the court knows, an 11-day trial, jury trial. There were 10 days of testimony. There were 21 witnesses, three damage experts. In the context of that lengthy trial, the only justification for the new trial was a single episode in which a lay witness, Mr. McLaughlin, an employee of Carver Luminous, responded to a question by stating, well, Hollybrook demanded and they demanded that we, Carver, give them a high sale in $750,000. This response was objected to, and it was in violation of the order in limine, the pretrial order in limine. Judge Foote excused the jury. The lawyers addressed the statement. The counsel for Hollybrook requested a curative instruction that was given, and it was a brutal instruction. If you read it, and I'll read it to you just a little bit, the trial court then polled the jury on whether their thought process had been tainted, and whether they could come up with a verdict based on all the other evidence. They all agreed they could. There was additional testimony. After a weekend break, the jury was charged. They deliberated. There was not a motion for mistrial. Is that right? There was. There was a motion. It was a contemporaneous oral motion for mistrial. You left that out. I mean, that's kind of important, isn't it? Yes, sir, it is. I mean, because if they hadn't, it would be over with. I agree. And the judge took that under advisement. There were written briefs following that, and then after the result was in, and after several months of deliberation, Judge Foote granted the motion for new trial and determined that the motion for mistrial was moved. It had been rendered moot by the new trial. But importantly here, even Judge Foote acknowledges there was only one episode of misconduct that would have contributed to the tainting of this jury award. There was no repeated attempts. This was not a case in which the misconduct was so significant. Again, there was a curative instruction given. Eventually, the jury was charged, and their sole interrogatory on damages was, please indicate the dollar amount of the damages proven by preponderance of the evidence that was caused by the defective Carver equipment. Now again, this jury heard all the evidence, not like the jury in the second trial. They heard all the evidence. They heard the evidence that maybe the Carver equipment wasn't defective. They heard the employees who were negligent. They heard the evidence that maybe it was some of the other equipment that was damaged. You know, counsel, you've got two real steep mountains here. I understand. I know you understand as well or better than I do. The first place you've got the district judge who saw, listened, understood, and then you got that $750,000 that showed up. Now, where did that come from? Well, I think the more important question is, where did the $1 million come from? Well, that's something else. Why not grant $750,000? Why not the jury grant $750,000 to go home? Why didn't they give them a third more? You know, you had somebody sophisticated. They knew attorneys get a third. Why not give them a third more? Give them a million dollars and go home. Why not double it? Why not $1,500,000 and go home? I mean, you know, there's no explanation for the $1 million. And even Judge Foote acknowledged it's pure speculation. It's pure conjecture. You know, there was only one instance. I mean, you could run that multiple with almost any number, you know, unless they came up with some, you know, goofy number like they did. There was a case that cited the materials that, you know, they came up with $314,000, $567,000. But if, you know, but if you didn't do that, I mean, you could always run some multiple of $750,000. I think we're doing more than speculating when we look at the $750,000. We know where that came from, don't we? Aren't we pretty sure? I don't. I don't think so. Couldn't the judge believe as she did that they were connected to what they heard? I believe she certainly believed it. I do. The question, I think, for this court is was that jury, and I get to this, you know, Mr. McLaughlin, he was just a witness. He's an employee of the equipment manufacturer who had been a defendant in the lawsuit. I mean, that jury is looking at him skeptical to begin with, you know. And he may just admit that just reading the transcript of that question and answer, it didn't offend me as much as apparently did Judge Foote. But maybe there was a something more that she was entitled to see, and it wasn't just something added by the witness. But doesn't there need to be more than that? I know, and apparently she decided there was, and she was there. But she doesn't articulate it. I mean, she obviously, if you read the entire record, you know, she and Mr. Salley were buttonheads on a pretty regular basis. She was obviously frustrated with him. She believed this to have been an intentional, you know, and I don't know whether it was or not. Later in the day, you know, Mr. Salley eventually said it was not intentional, but she obviously didn't believe that. But again, you don't punish the lawyer by making him do a new trial. You sanction him, and she did that, you know, and he got sanctioned a pretty good little pop. And she spends a lot of her opinion talking about how this was intentional, which to me is just irrelevant. I mean, the question is, was there any evidence that jury, you know, was tainted? And she gave, I mean, a great instruction. You just witnessed a very clear example of that. Her actions were possibly sanctionable, but that's for the court to decide at another date. No one at any time during the trial is to suggest a number of any kind of the jury. The suggestion of that number is a mistake that's been made here. It's a violation of the entire trial process. And then she asked him, can you ignore that? Can you move on and render your decision without regard for that? And they all acknowledged they could. And in the, you know, because they've got case law there that if you poll the jury, if you give them a cautionary instruction and you poll them, then that presumption is no longer even rebuttable, you know. The question here is, what's the evidence to rebut this curative instruction? And there's simply no cases out there, in the Fifth Circuit particularly, where a single episode is sufficient to warrant a whole new trial. Well, there may not be anything quite of this instance. And there's the case law there that talks about persistent misconduct that permeates the trial. But there's also case law that talks about an improper comment gravely impairing the common dispassionate deliberations of the jury. And I think Judge Foote was, I mean, it's abuse of discretion. And looking at the whole case, and looking at all that she knew, and no justification for that number that you standing there can give us, it was at least a sufficient concern to her that that taint was immovable, unremovable, as to justify a new trial. And there's some good arguments. And I would say that at the 1.75, it's probably not against the great weight of the evidence, because the evidence was all over the board as to damages. But that's not the standard for deciding whether a motion for a new trial should not have been granted. So we'll have to meditate on that. I think it is relevant. And again, there were numbers all over the board. I mean, the baseline number for Hollybrook was two million. Everybody agrees that was inflated. Everybody agrees Hollybrook was going to lose money for the first three or four years. I mean, there's plenty of evidence there for the jury to have concluded that a number in that range was appropriate. And quite frankly, I'd say at least a third of the jury trials I do, I come out of there going, how'd they come up with that number? So again, that presumption, when you give the instruction, can't be rebutted by conjecture or speculation. And that's all we got here. And I know I got a high burden, but I think this court ought to give some deference to that jury finding. The only jury that heard all the evidence in the case. I'm going to move on quickly to the work product exclusion, the damages. The term property damage was defined by the policies. I know y'all have heard that a million times. I'm not going to repeat it. The courts have held that property damage includes purely economic losses. Now that term property damage, it's used in the insuring agreement, but it's also used in the exclusions. So if you have coverage for economic damage, economic losses, that's property damage under the insuring agreement, then if an exclusion is applicable, those same economic damages are going to be excluded. And I'm not sure that Judge Walter caught that distinction. In this case, Hollybrook argued, and the jury found that all of the damages, including the alleged economic losses, arose solely from defects in the carver equipment. So while the carver equipment was injured by these defects, the evidence showed that there was no injury whatsoever to the other remaining non-carver equipment. So the inability of the plant to operate was the sole result of physical injury to the carver equipment, not to any physical injury to any other property. Now there's no question that the economic loss associated with the damage to the carver equipment is not covered. That's excluded under the work product exclusion. So if we had a circumstance in which the whole plant was nothing but carver equipment, the loss of income claim, the lost profit claim, would be excluded because it would all arise from, there'd be no question that it all arose from the carver equipment. This case presents a unique situation. I was not able to find a case like it. The Council for Hollybrook wasn't either. In this case, we've got physical injury only to the product manufactured by the insurer, that is the carver equipment. We've got a loss of use claim associated with the physical injury of that carver equipment. Now it's clear again, that loss of use claim is not covered under the policy. But we've got an additional allegation that there's a loss of use of the other non-carver equipment. And that claim for loss of use for the non-carver equipment is indistinguishable from the loss of use claim for the carver equipment. It's the same loss of use. Again, there's no damage to the non-carver equipment. It's perfectly capable of functioning. It can function. It could do what the carver equipment was physically injured that the plant wasn't able to run. So is this purely duplicative loss of use claim covered simply because it happens to implicate some non-carver equipment as well? Well, what do you do with what you apparently think is a poorly reasoned decision in Martco? Isn't that fairly similar to the situation that we have here? It is. And Your Honor, you know more about Martco than I do. You were on the panel. You heard everything. From the briefs, I couldn't tell if there was physical injury to other property or not. I mean, not from the brief, but from the opinion. It was clear that there was physical damage to that insurance product. What you couldn't pick up from Martco is whether or not there was physical injury to the other property. And if that was the case, then I would suggest that's a good decision. And I would suggest it's relevant, but this case is different because you don't have property damage to the other equipment in this case. If Martco did not involve physical injury to other property, then I would suggest it's not necessarily consistent with Stewart and some of the other Louisiana cases, which hold that all of the losses that are a direct result of the damage to the insured product is excluded. And that, for example, in the Shaw Group case, this was a decision by Judge Brady. You had a defective product which resulted in delays in a construction project. And there, Judge Brady said Louisiana law excludes consequential damages directly resulting from defective products. But the exception to the exclusion of consequential damages, well, I'm sorry, that Louisiana law excludes all those consequential damages directly resulting from the defective products, including the cost associated with the delay of the project, which is analogous to the lost profits. Now, the exception, the exclusion doesn't apply if you've got some kind of damage to other property. But, and again, in this case, there is no damage to that other non-carver equipment. In Bollinger Shipyard's case, that's a Judge Berrigan case out of the Eastern District. Again, there's a crane tower on this barge that falls off. And there was a coverage issue. And she said to avoid summary judgment, the plaintiff had to show that the barge was physically injured in some way. And the court granted summary judgment because there was no proof that any of the plaintiff's damages derived from physical injury to the barge. They all derived from the crane. There was no injury to the barge. In Stewart Interior Contractors, which is the Louisiana case, Fourth Circuit 2007 decision, the allegation there was there was allegedly defective steel studs. And the court held there's going to be no coverage for the claims for damages for the studs, all costs related to replacement of the studs, any damage to the property attendant to removal and repair of the studs, and any loss of use or lost profits caused by delay in completion of the building. So if your delays, if your lost profits are solely the result of the insured product with no physical injury to any other piece of equipment at the site, the courts in Louisiana and the lower courts in the Fifth Circuit have been pretty unanimous. There's no coverage for that. And so in this case, again, you've got only damage to the carburetor equipment. Everything arises from that claim, from that damage. The lost profits are all directly tied to there. You can't tie those direct profits to any damage to any other equipment. The same rationale on the attorney's fees, our brief has a lot of reasons why attorney's fees aren't covered, but another reason is the work product exclusion. The attorney's fees are recoverable only for the retribution claim, which is for the return of the purchase price for the damaged equipment. Well, all of the damages for that equipment, for the consequential damages arising from that injury are excluded. Those include the claims for attorney's fees. Also, we cited the court, Louisiana Supreme Court case. Again, there are no decisions directly on point that say damages in a retribution case are covered or not covered under an insurance policy. Cases cited by plaintiff is a constitutional challenge where there's, you know, I believe there's loose, some dicta in there about it being penalties. You know, my case was, the Supreme Court case, was whether interest is recoverable on attorney's fees, pre-judgment interest. And the court there, again, didn't address it in the context of insurance policy, but said, no, these aren't damages, this is like a penalty. And so we don't give you a third circuit with a DNO policy. My time's up. Thank you, Your Honor. Thank you, Mr. Kennedy. Ms. Condry, you've saved time for rebuttal. Can you respond to those authorities that Mr. Kennedy has listed for us, the state of Louisiana cases, as well as the federal that seem to indicate no consequential damages? And particularly this, uh, apparent decision was the loss of use and not tangible damage to the other parties. Well, yes, sir. First, I would, I would strongly disagree that there is no precedent here. The Mark Coe case and the Riley Stoker case dealt with the exact same policy language. And what's important here is the exception to the impaired property exclusion. There's two ways, physical damage to non-carver equipment, which is what he's talking about. That's an easy one. That's easy. But the policy also provides that even if you have no physical damage to non-carver equipment, but that you lose the use of that equipment because the carver equipment is breaking down, that's property damage as well. They are completely ignoring why we even had the jury answer that question. Once that question was answered, we are in the realm, we have coverage. What they're trying to do is merge the work product exclusion with the impaired property exclusion. And if you do it the way they're doing it, this policy makes no sense because one provision gives Hollybrook the coverage. Another provision takes it away under the same argument. Yes, it all arises out of the defective equipment, but because the defective equipment caused the loss of use, that's the separating wall there. These cases that he has cited, Bollinger, I recall the Bollinger case, and I don't know that there was any loss of use that you could attribute. I honestly don't remember. I've cited Bollinger. I was thinking that they were able to recover consequential damages of not being able to do certain things but I won't go there for sure. I cited Bollinger myself. The other cases, the Shaw case, one of these cases had to do with attorney fees in a worker's comp case. None of the cases on attorney fees are on point with this case. What's important here is that if this policy has an exception to the exclusion that Hollybrook triggered with the jury question about sudden and accidental breakdown, and on the other hand, well, because it all relates back to our piece of property, then you can't get anything anyway. Then the policy under Louisiana law is ambiguous and it's got to be construed in favor of the insured. This is not a novel question. It does get kind of Alice in Wonderland now and then, trying to read these policies and go back over it all, but that's the beauty of the Fifth Circuit's precedent on these policies. It lays it out succinctly and properly and it's been followed going on 20 years now in the Riley Stoker case, which, by the way, did specifically include loss of use to non-injured property. I really don't think there's anything here to distinguish this situation at all. I would just like to quickly go back to one point Judge Rivley made about reading this record cold on having somebody say $750,000 and a new high cell. What you have to understand is that question and that series of questions was being objected to over and over again, because I couldn't figure out, what is he doing? Why is he asking these witnesses? She took us in the back. We had a sidebar. He was given the opportunity. What are you getting at? Now I see, he was dancing on the head of a pin to not every morning we were required to get there 30 minutes early and discuss each exhibit, each issue, each witness, and what was going to happen that day that might present a problem. That would have been a good opportunity to say, I believe I'm entitled to have you revisit the order granting Hollybrook's motion in limine. There were so many opportunities for this not to have happened. The way it came out, the witness had been at every deposition, at every hearing, sitting in trial for two weeks. He was the vice president of the company. It was clear he knew he was having trouble getting out that amount of money. That's why he blurted it out the way that he did. The second trial, all of those facts were litigated again. Hollybrook's, I'm sorry. Yes, your time has expired. Thank you, Ms. Condry. Your case is under submission.